UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                   :

RONNIE COLE,                        :

                  Plaintiff,         :

                                     :

         -v.-                        :           04 Civ. 8906 (GEL)

                                     :

GLENN GOORD et al.,             :         **OPINION AND ORDER**

                                   :

                 Defendants.     :

                                   :
------------------------------------------------------------x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 4/30/09

Ronnie Cole, Rome, NY, pro se.

Andrew M. Cuomo, Attorney General of the State
of New York, New York, NY, by Susan H. Odessky,
Assistant Attorney General, for defendants.

GERARD E. LYNCH, District Judge:

      Plaintiff Ronnie Cole, an inmate in the custody of the New York State Department of

Correctional Services ("DOCS"), brings this action alleging that defendants Glenn S. Goord,

Brian Fischer, Lester Wright, John Perilli, Eileen Hansen, Joyce Gutowski, and Nelson Muthra

were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.

Defendants have moved for summary judgment. For the reasons stated below, their motion will

be granted.

## BACKGROUND

### I.    The Parties

      Ronnie Cole is currently a New York State prisoner incarcerated at Mohawk Correctional

Facility. The Complaint, however, concerns alleged mistreatment of the plaintiff while he was

incarcerated at Sing Sing Correctional Facility ("Sing Sing") between January 13, 2004, the date

he was transferred to Sing Sing, and October 1, 2004, the date he filed his Complaint.

Glenn Goord was the Commissioner of DOCS during the time period relevant to the Complaint. Dr. Lester Wright was, and remains, the Deputy Commissioner of DOCS and its Director of Health Services. Brian Fischer was the Superintendent of Sing Sing during the relevant time period.

Dr. John Perilli was the Facility Health Services Director ("FHSD") at Sing Sing during the relevant time period. The FHSD is the medical authority who supervises all health unit staff and is responsible for all aspects of inmate health care services. Prior to his appointment as FHSD, Dr. Perilli practiced as a general internist for 24 years. (Def.'s Rule 56.1 Stmt. ¶ 2.) Eileen Hansen was the Nurse Administrator at Sing Sing during the relevant time period. She supervised Sing Sing's hospital and nursing staff. (Id. ¶ 6.) Joyce Gutowski has been a Registered Nurse ("RN") at Sing Sing since October 1999. Her duties include seeing inmate patients at sick call, dispensing medications, and arranging for appointments with doctors and for outside medical trips. (Id. ¶ 4.) Nelson Muthra has been a Physician's Assistant ("PA") at Sing Sing since 1998. His duties include treating inmate patients at sick call appointments, following up on medical appointments, arranging consultations with specialists, ordering lab tests and x-rays, and referring inmate patients to physicians at Sing Sing or at outside facilities. (Id. ¶ 5.)

## II.     Cole's Relevant Medical History Prior to his Arrival at Sing Sing

Cole has been seen and treated throughout his incarceration at different facilities by a number of doctors for his extensive urethral stricture disease. (See Declaration of John Perilli, M.D., dated Sept. 19, 2008 ("Perilli Decl."), Ex. B, at 2095-97.)[1]  Cole has a perineal

---

[1] The Perilli Declaration is attached to the Declaration of Susan H. Odessky, dated Sept. 22, 2008, ("Odessky Decl.") as Ex. B.  The page numbers refer to the Bates numbers assigned to

urethrostomy – a surgical construction of an artificial excretory opening from the urethra –

through which he catheterizes himself.  (Def.'s Rule 56.1 Stmt. ¶ 11.)  Before being transferred

to Sing Sing, Cole underwent numerous procedures to correct his urological problems; all of

these procedures failed, in part due to Cole's poor post-operative compliance.  (Perilli Decl., Ex.

B at 2429.)

    Doctors who have examined Cole have noted that there are two major procedures that

might help alleviate the symptoms of Cole's condition.  The first procedure is an abdominal

stoma with a urinary diversion ("the stoma/diversion procedure"); the second is urethral

reconstruction surgery.  In July 2001, Dr. Kevin Pranikoff, a urologist at SUNY Buffalo,

recommended that Cole have the stoma/diversion procedure.  (Perilli Decl., Ex. B at 2095-97.)

Addressing the urethral reconstruction surgery option, Dr. Pranikoff's report stated that if Cole

"is able to develop urinary control and desires urethral reconstruction, then he needs to

understand that it is an extremely high-risk procedure with a high chance of failure" and that

Cole "would only become a candidate for [the surgery] should he be able to develop a more

normal voiding and continence pattern."  (Id.)

    On June 18, 2002, Cole was seen by another urologist, Dr. Mark White at Albany

Medical Center.  Dr. White's report noted that Cole would most benefit from the

stoma/diversion procedure and that he did not feel that the reconstructive surgery option favored

by Cole would be successful.  (Id. at 1201, 2101-02.)  Dr. White also wrote that, while he would

be willing to refer Cole to a center specializing in urethral reconstruction surgery, he had

counseled Cole that the chances for success from that procedure were quite low and that Cole

---

Cole's medical records.

would most likely still require the urinary diversion.  (Id. at 2101-02.)

On August 30, 2002, Dr. Pranikoff stated in a letter to DOCS that he was not sure that Cole "understands, or chooses to understand, the complexity of his problems or my feelings that repairing the urethra will not restore his continence."  (Id. at 2099.)  Dr. Pranikoff noted that Dr. Zahi Makhuli, another urologist to whom Cole had been referred, had also recommended the stoma/diversion procedure rather than the urethral reconstruction.  (Id.)

Cole did see at least one urologist who felt that the urethral reconstruction surgery would be Cole's best option.  A Dr. Lieb[2] saw Cole on June 27, 2003, and reported that Cole needed a "2 stage repair [i.e., the reconstructive surgery]. . . at a special center beyond Albany, Syracuse, and Burlington," and that, if that surgery failed, Cole should have the stoma/diversion procedure.  (Declaration of Ronnie Cole, dated Nov. 13, 2008 ("Cole Decl."), Ex. A at 1174.)

On September 12, 2003, DOCS Health Services staff indicated in an e-mail that DOCS was willing to transfer Cole to Sing Sing to facilitate the urethral reconstruction surgery but that Cole's case was medically complicated, and was made more so due to the lack of cooperation from Cole.  (Perilli Decl., Ex. B at 2426-28.)[3]

## III.   Cole's Relevant Medical Treatment at Sing Sing

On January 13, 2004, Cole was transferred from Clinton Correctional Facility to Sing Sing.  (Compl. ¶ 19.)   Upon his arrival at Sing Sing, Cole was treated first by Dr. Mah, and then

---

[2] Dr. Lieb's first name is not evident from the record.

[3] The record includes numerous examples, dating from 1998, of Cole's refusal of medical treatment or supplies.  Among the treatments he refused were self-catheterizations, urethral dilations, a trip to the urology clinic at SUNY Health Science Center, scrotal and bladder examinations, dressing changes and sitz baths, antibiotherapy for possible perineal/urologic infection, and the stoma/diversion procedure.  (See Def.'s Rule 56.1 Stmt. ¶ 48; Perilli Decl. ¶ 42.)  In May of 2004, Cole also refused all weekly medical supplies.  (Perilli Decl. ¶ 44.)

by Physician's Assistant Nelson Muthra.[4]   (Cole Dep. 84-85.)  According to Cole, both Dr. Mah

and another doctor whose name Cole does not remember agreed that Cole should have the

urethral reconstructive surgery.  (Id. 84.)

On February 9, 2004, Dr. Perilli had Cole admitted to the infirmary for observation due

to skin breakdown at his urethrostomy site.  (Perilli Decl. ¶ 13.)  On February 19, 2004, after

attempting to treat Cole's constant incontinence, bacterial infections, and skin breakdowns, Dr.

Perilli referred Cole to an outside urologist.  (Id. ¶ 14.)

On March 24, 2004, the urologist, Dr. Marc Janis, recommended that Cole have either

the stoma/diversion procedure or the urethral reconstruction surgery.  (Id., Ex. B at 863.)  Dr.

Perilli decided that Cole should have the stoma/diversion procedure.  In a March 26, 2004, letter

to Cole in response to Cole's requests that he be scheduled for the reconstruction surgery, Dr.

Perilli explained that

> a continent diversion with a catheterizable stoma has been
> recommended on many occasions, and that you refused this, most
> recently on 3/24/04.  We note that you have persisted in your
> demand for DOCS Health Services to authorize a penile (urethal)
> reconstruction, an elective reconstructive procedure which was
> previously denied by Albany as not medically indicated treatment.
> This department agrees with the denial, a denial consistent with
> not only the provisions of your health coverage under DOCS, but
> to the best of our knowledge, inconsistent with the general
> provisions regarding authorization for reconstructive surgeries of
> most Health Care insurers in this country.  Further, we state to you
> that the reconstructive surgery is not a standard treatment for this
> condition; that urological consultants have stated this procedure is
> outside their abilities; that none of the physicians here, with a
> combined clinical experience of over 100 years, ha[s] ever seen
> this procedure done; that this procedure is known to have a high
> complication and failure rate; and in the Northeast is performed by
> only a handful of subspecialists.

---

[4] Dr. Mah's first name is not given in the record.

(Id. ¶ 16.)

On April 26, 2004, Dr. Perilli and P.A. Nelson requested another urology consult for Cole. (Id. ¶ 19.) Cole was again seen by Dr. Janis on May 26, 2004, at which time Dr. Janis recommended that Cole have a cystoscopy and video urodynamics test and that he be scheduled for the stoma/diversion procedure. (Id., Ex. 2 at 861.) Although Cole initially refused to sign the consent forms to have the test and the recommended procedure, and refused any medical assessment by Dr. Perilli, he changed his mind and underwent the test on August 4, 2004. (Id. ¶¶ 20, 22, 23.) On August 7, 2004, Dr. Aman Bakshi, another doctor at Sing Sing, referred Cole to Dr. Janis again. (Id. ¶ 24.) On August 18, 2004, Dr. Janis examined Cole and recommended (1) that he undergo the stoma/diversion procedure, (2) that he be given four catheters a week, and (3) that he be given Tylenol #3 for pain relief. (Id. ¶ 25; Ex. 2 at 1544.)

On September 8, 2004, Cole saw Dr. Janis again as a prerequisite to the scheduling of the stoma/diversion procedure. (Id., Ex. 2 at 1546.) At that visit, Dr. Janis recommended that the diversion procedure be authorized and also that Cole be permitted two showers daily. (Id.) On September 29, 2004, Dr. Bakshi referred Cole for the stoma/diversion, but Cole refused to undergo the procedure. (Perilli Decl. ¶ 28.) Cole has continued to refuse to undergo the stoma/diversion procedure, lobbying instead for the urethral reconstruction surgery.

Throughout the relevant time period, Cole filed a number of grievance complaints against the medical staff at Sing Sing. The record includes grievances Cole filed against Nurses Hansen, Gutowksi, and Ricks (who is not named in the instant Complaint), alleging among other things that the nurses were unresponsive and rude when he requested that the dispensary restock the diapers he needed. (See Cole Decl., Ex. D at 690-93, 714-15, 822.) The record also includes a grievance Cole filed against Dr. Perilli for failing to follow Dr. Janis's recommendations. (Id. at

6

829.)

On October 1, 2004, Cole filed this Complaint, alleging deliberate indifference to his serious medical needs in violation of the Eighth and Fourteenth Amendments.  The Complaint names Goord, Fischer, and Wright in their individual and official capacities, and Perilli, Muthra, Hansen, and Gutowski in their individual capacities, and seeks an order directing DOCS to comply with the treatments recommended by Dr. Janis.  Cole also seeks compensatory damages of $250,000 and punitive damages totaling $1,150,000 from the defendants.

## DISCUSSION

### I.      Summary Judgment Standard

Summary judgment must be granted where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party.  Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001).  To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

When a party is proceeding pro se, a judge must assess his pleadings by a more generous standard than that accorded to pleadings drafted by lawyers.  Bussa v. Alitalia Linee Aeree Italiane, S.P.A., No. 02 Civ.10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004).  Despite this more lenient treatment, a pro se litigant must still meet the threshold requirements to survive

7

a motion for summary judgment.  Id. at *11.  See also Carey v. Crescenzi, 923 F.2d 18, 21 (2d

Cir. 1991); Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995),  reh'g granted on other

grounds, 914 F. Supp. 1004 (S.D.N.Y. 1996) (holding that a "pro se party's bald assertion,

completely unsupported by evidence, is not sufficient to overcome a motion for summary

judgment") (internal quotations omitted).

## II.    Eighth Amendment: Deliberate Indifference to Serious Medical Needs

The Eighth Amendment protects against the "unnecessary and wanton infliction of pain,"

Hope v. Pelzer, 536 U.S. 730, 737 (2002), and its protection extends to the provision of medical

care in prisons, Estelle v. Gamble, 429 U.S. 97, 103 (1976); accord Hathaway v. Coughlin, 37

F.3d 63, 66 (2d Cir. 1994).  Inmates are not free to seek out their own doctors or obtain their own

private health insurance, and therefore it is the "government's obligation to provide medical care

for those whom it is punishing by incarceration." Gamble, 429 U.S. at 103.

To state a constitutional claim based on the denial of medical care, a plaintiff must satisfy

both an objective and a subjective component.  To determine whether a plaintiff has satisfied the

objective component, courts have taken into account both the seriousness of the plaintiff's

medical condition, Hathaway, 37 F.3d at 66, and the severity of the alleged deprivation of

appropriate care, Wilson v. Seiter, 501 U.S. 294, 298 (1991); Chance v. Armstrong, 143 F.3d

698, 702 (2d Cir. 1998).

The subjective prong requires that the accused prison official have acted with a

sufficiently culpable state of mind.  Wilson, 501 U.S. at 297-98.  To be sufficiently culpable, the

defendant must act with deliberate indifference.  That is, he must "know[] of and disregard[] an

excessive risk to inmate health or safety; the official must both be aware of the facts from which

the inference could be drawn that a substantial risk of serious harm exists, and he must also draw

8

the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). This state of mind is equivalent to the familiar standard of "recklessness" as used in criminal law. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003).

Defendants do not dispute that Cole suffers from a serious illness -- extensive urethral stricture disease. The primary question in dispute is whether Cole is able to establish that the defendants knew of and disregarded excessive risks to his health.

### III.    Glenn Goord, Brian Fischer, and Lester Wright

#### A.    Official Capacity Claims

Cole asserts claims against Goord, Fischer, and Wright in both their individual and official capacities. The Eleventh Amendment precludes suits in federal court against a State or its agents absent the State's unequivocal consent to such suits. Pennhurst Interstate Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984). Because "[s]uits against state officials in their official capacities [are] treated as suits against the State" for purposes of the Eleventh Amendment, Hafer v. Melo, 502 U.S. 21, 25 (1991), Cole's damages claims against Goord, Fischer, and Wright in their official capacities must be dismissed for lack of subject matter jurisdiction. See Posr v. Court Officer Shield # 207, 180 F.3d 409, 414 (2d Cir. 1999).[5]

#### B.    Individual Capacity Claims

A claim for money damages under § 1983 may not lie against defendants who were not personally involved in the constitutional violation. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995); see also Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987); Williams v. Smith, 781 F.2d

---

[5] Although the Eleventh Amendment does not bar claims for declaratory and injunctive relief, Cole has failed, as will be discussed below, to establish that his constitutional rights were violated so as to merit such relief.

319, 323 (2d Cir. 1986).  Goord, Fischer, and Wright all held supervisory position within DOCS,

and supervisors cannot be held liable under § 1983 solely for the acts of their subordinates.  See

Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985).  The personal involvement of a

supervisory defendant may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional
> violation, (2) the defendant, after being informed of the violation
> through a report or appeal, failed to remedy the wrong, (3) the
> defendant created a policy or custom under which unconstitutional
> practices occurred, or allowed the continuance of such a policy or
> custom, (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the
> defendant exhibited deliberate indifference to the rights of inmates
> by failing to act on information indicating that unconstitutional
> acts were occurring.

Colon, 58 F.3d at 873.

Cole makes no specific allegations against Goord in his Complaint and in fact concedes

in his deposition testimony that his claims against Goord are based solely on Goord's position as

Commissioner at the time of the events in the Complaint.  (Deposition of Ronnie Cole, dated

Aug. 20, 2007 ("Cole Dep."), 113-14.)[6]  Accordingly, summary judgment must be granted to

Goord.

In his Complaint, Cole alleges no specific misconduct by Fischer, who was the

Superintendent of Sing Sing during the relevant time period.  In his deposition, however, Cole

contends that he spoke to Fischer about his situation – i.e., that he informed Fischer of a

purported constitutional violation – and that Fischer told him that Dr. Perilli was a good doctor

and that Fischer would defer to Dr. Perilli's judgment – i.e., that Fischer failed to remedy the

---

[6] Relevant pages of Cole's deposition transcript are attached as Ex. G to the Odessky
Declaration.

wrong. (Cole Dep. 114.) Even crediting Cole's version of events, the reliance of Fischer, who is not a doctor, on the advice of Dr. Perilli, who had treated Cole and who was the FHSD, does not amount to a constitutional violation. See Joyner v. Greiner, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) (a prison administrator is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners, and cannot be held to have been personally involved if he does so). Furthermore, as discussed below, the refusal of Dr. Perilli to authorize a particular course of treatment did not violate the Eighth Amendment.

In his Complaint, Cole alleges that Wright, the Deputy Commissioner of Health Services for DOCS, also deferred Cole's complaints to Dr. Perilli. (Compl. ¶¶ 21-22.) In his deposition, Cole elaborates that he wrote letters complaining about his treatment to Wright and that Wright responded only with what were essentially form letters. (Cole Dep. 114.) Here, too, Cole's assertions do not rise to the level of a constitutional violation. As was the case with Fischer, (1) Wright had every reason to rely upon the advice of Dr. Perilli, who was treating Cole at Sing Sing, and (2) what Cole complained of was not a constitutional violation. Summary judgment is therefore granted as to Fischer and Wright.

## IV.    Dr. John Perilli

Throughout 2004, Dr. Perilli and his medical staff treated Cole for his incontinence, bacterial infections, and skin breakdowns. (Def.'s Rule 56.1 Stmt. ¶¶ 17, 18, 23.) In addition, Dr. Perilli and his staff repeatedly referred Cole to an outside urology specialist, a fact which Cole does not dispute. (See Compl.¶ 17; Cole Dep. at 77.) Cole contends that his rights were violated by Dr. Perilli's failure to follow all of the recommendations of the urology specialist. Specifically, Cole complains that Dr. Perilli did not take the recommendation of Dr. Janis that

11

Cole: (1) have the urethral reconstruction surgery; (2) be given Tylenol #3 for pain; (3) be given four catheters a week; and (4) be permitted to have two showers a day.[7]

A.    The Urethral Reconstruction Surgery

The medical records belie Cole's contention that Dr. Janis recommended that Cole have the urethral reconstruction surgery instead of the stoma/diversion procedure. Rather, in his first consultation with Cole, Dr. Janis presented the reconstruction surgery as one of two viable options – the other being the stoma/diversion procedure. (Perilli Decl., Ex. 2 at 863.) At subsequent consultations, Dr. Janis recommended only the stoma/diversion procedure. (Id. at 861, 1544, 1546.) Even if Dr. Janis had recommended the urethral reconstruction surgery as the preferred treatment, however, DOCS rules did not require Dr. Perilli to follow a consultant's recommendations if he believed that another course of treatment was more appropriate. (Perilli Decl. ¶ 17.) The record reflects that at least three urologists who treated Cole prior to his transfer to Sing Sing in 2004 opined that the reconstruction surgery was not advisable as it posed a high risk and had a low rate of success. (Def.'s Rule 56.1 Stmt. ¶¶ 11-13.) The defendants' urological expert, Dr. Arthur Smith, reviewed Cole's medical records, as well as Cole's Complaint and deposition transcript, and supported Dr. Perilli's finding that the stoma/diversion procedure, and not the urethral reconstruction, was medically appropriate. (See Smith Rpt., dated Apr. 29, 2008, at 1.)[8] Dr. Smith also noted that he did not see any evidence in the medical

---

[7] To the extent that Cole also claims that Dr. Perilli failed to treat his back pain (see Compl. ¶¶ 15-16), that contention is belied by the record. Although Dr. Perilli's medical staff referred him to an orthopedic specialist on September 9, 2004, Cole refused to go to his appointment. (Def.'s Rule 56.1 Stmt. ¶¶ 34-35.) Cole's Complaint provides no indication of what treatment he expected Dr. Perilli to provide him with regarding his back pain.

[8] The Smith Report is attached to the Odessky Declaration as Ex. F.

12

records that Cole had not received adequate medical attention while at Sing Sing, and that "it is
apparent that [Cole] is not a very compliant patient and this certainly has not help[ed] to
maintain his progress."  (Id.)

 The law is well established that mere differences in medical opinion, or for that matter
even malpractice, are not sufficient to make out an Eighth Amendment claim:

> [A] complaint that a physician has been negligent in diagnosing or
> treating a medical condition does not state a valid claim of medical
> mistreatment under the Eighth Amendment.  Medical malpractice
> does not become a constitutional violation merely because the
> victim is a prisoner.  In order to state a cognizable claim, a
> prisoner must allege acts or omissions sufficiently harmful to
> evidence deliberate indifference to serious medical needs.  It is
> only such indifference that can offend evolving standards of
> decency in violation of the Eighth Amendment . . . . [W]hether . . .
> [certain] diagnostic techniques or forms of treatment [are]
> indicated is a classic example of a matter for medical judgment.  A
> medical decision not to order an X-ray, or like measures, does not
> represent cruel and unusual punishment.  At most it is medical
> malpractice, and as such the proper forum is the state court

Gamble, 429 U.S. at 106-07 (internal quotations omitted); see also Woods v. Goord, No. 01 Civ.
3255, 2002 WL 31296325, at *6 (S.D.N.Y. Oct. 10, 2002) ("[D]isagreements over medications,
diagnostic techniques . . . , forms of treatment, or the need for specialists or the timing of their
intervention, are not adequate grounds for a section 1983 claim.")

 Cole's claim against Dr. Perilli amounts to just such a disagreement over forms of
treatment.  Cole clearly believes that the urethral reconstruction surgery is the solution to his
problems.  But Dr. Perilli believed, and the State's expert concurs, that this surgery is
contraindicated for various reasons.  Who is right about which treatment would be better for
Cole is, of course, a question of fact.  But the record is devoid of any evidence that Dr. Perilli's
conclusion was anything other than a conscientious medical judgment, and no reasonable jury

could conclude that Dr. Perilli's medical opinion that the stoma/diversion procedure was preferable to the urethral reconstruction surgery desired by Cole – an opinion supported by repeated recommendations by outside urology specialists – amounts to deliberate indifference on the part of Dr. Perilli.

B.    Pain Medication

Dr. Perilli did order that Cole be given non-narcotic pain medication as opposed to the Tylenol #3 recommended by Dr. Janis. Rather than exhibiting deliberate indifference to Cole's medical condition, however, Dr. Perilli had determined that Cole's pain was being managed appropriately and that a narcotic such as Tylenol #3 was unnecessary; because of concerns regarding the hoarding and selling of narcotic drugs, Sing Sing's policy was to prescribe narcotic drugs to inmates only when absolutely necessary. (Perilli Decl. ¶ 32.) Cole cannot establish that, by changing his medication to a non-narcotic, Dr. Perilli knew of and disregarded a "substantial risk of serious harm" to Cole's health. Farmer, 511 U.S. at 837.[9]

C.    Catheters

Next, Cole attempts to establish a claim of deliberate indifference based upon a disagreement about treatment. While Cole asserts that Dr. Perilli was deliberately indifferent because he failed to follow Dr. Janis's recommendation that Cole be provided with four catheters a week, Cole provides no evidence that four catheters a week are required for his condition. Dr.

_____

[9] Cole's reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment (see Affirmation of Ronnie Cole in opposition to Def.'s motion for summary judgment, dated Dec. 11, 2008, ¶¶ 12-14) does nothing to establish that Dr. Perilli violated Cole's Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference. See Gamble, 429 U.S. at 97.

14

Perilli's contention that the two or three catheters provided to Cole at Sing Sing were well within the community standard and caused no detriment to Cole's health (Def.'s Rule 56.1 Stmt. ¶ 37) is supported by Dr. Smith, whose opinion is that there is no medical difference whether a patient has one, two, or four catheters a week.  (Smith Rpt at 1.)  Dr. Smith further noted that most of his patients use a single catheter for several weeks and that a catheter is never sterile when a patient is catheterizing himself.  (Id.)  Cole identifies no evidence in the record, including the recommendation of Dr. Janis, indicating that the failure to provide a specific number of catheters was medically insufficient, let alone that it represented a deliberate indifference to any serious medical risk.

   D. <u>Additional Showers</u>

   Dr. Perilli's failure to follow Dr. Janis's recommendation that Cole be permitted two showers a day does not rise to the level of a constitutional violation.  While Cole attributes his infections to the fact that he did not receive two showers a day (Compl. ¶ 4), his only evidence of this is his own conclusory statement.  Dr. Perilli's opinion that there was no medical requirement that Cole be permitted two showers a day (Perilli Decl. ¶ 36) is echoed by Dr. Smith's statement that Cole's abcesses would not likely be helped by more frequent showers.  (Smith Rpt at 1.)  In addition, the uncontradicted evidence is that Cole had access to running water in his cell and could wash as needed at any time.  (Perilli Decl., Ex. 2 at 190.)

   Dr. Perilli and his medical staff treated Cole's serious medical condition, referred him to a specialist, considered the specialist's recommendations, and rejected some of those recommendations for reasons that, right or wrong, no reasonable jury could find represented deliberate indifference to Cole's needs.  Summary judgment must therefore be granted to Dr. Perilli.

15

## V.   Eileen Hansen

While Cole makes no specific allegations against Nurse Administrator Hansen in his complaint, in his deposition Cole asserts that she (1) directed Dr. Perilli to deny medical treatment and supplies to Cole and (2) denied Cole diapers, vitamins, lotion, and access to the urologist. (See Cole Dep. 115-17.)  Apart from Cole's assertions, nothing in the record supports these allegations.  First, Hansen did not have the authority to direct Dr. Perilli – who was the FHSD – or any other physician, to treat or refuse to treat an inmate patient, nor did she have the authority to decide whether an inmate patient should be seen by a specialist. (See Declaration of Eileen Hansen, dated Sept. 23, 2008 ("Hansen Decl."), ¶¶ 7, 8.)[10]  As for Cole's claim that Hansen denied him medical supplies, the record includes a memo from Hansen to the Deputy Superintendent of Security in January of 2004, advising him of the medical supplies that were being provided to Cole. (Id. ¶ 9.)  The list provided Cole with, among other medical supplies, 50 diapers and 15 lubricants per week. (Id.)  The record does not include any prison hospital records supporting Cole's assertion that Hansen denied him medical supplies and Hansen testified that "[a]t no time did I deny [Cole] access to medical care or medical supplies." (Id. ¶ 10.)

Even assuming, however, that the sworn testimony of Cole and Hansen creates a credibility issue not amenable to resolution on summary judgment, see Colon, 58 F.3d at 873, Cole's allegations do not amount to sufficiently serious behavior to rise to the level of a constitutional violation.  As noted above, to establish an Eighth Amendment claim based on the denial of medical care, a plaintiff "must make an objective showing that the *deprivation* was

---

[10] Hansen's Declaration is attached as Ex. E to the Odessky Declaration.

16

sufficiently serious, or that the result of defendant's denial was sufficiently serious." Smith, 316 F.3d at 186 (emphasis in original) (internal quotations omitted); see also Hudson v. McMillian, 503 U.S. 1, 8 (1992) (in evaluating an Eighth Amendment claim, courts should consider "if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation" (internal quotations omitted)). So, for example, when a prisoner bases an Eighth Amendment claim on a temporary delay in the provision of otherwise adequate medical treatment, "it is appropriate to focus on the challenged *delay* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." Smith, 316 F.3d at 185 (emphasis in original) (internal quotations omitted).

While Cole undoubtably suffers from a serious medical condition, he offers no evidence that any limitation on supplies for which – taking the evidence in the light most favorable to Cole – Hansen is responsible created a serious health risk to Cole. Summary judgment will therefore be granted in favor of Hansen.

## VI.    Joyce Gutowski

Cole makes no specific claims against Gutowski in his Complaint, but in his deposition he alleges that Gutowski violated his constitutional rights by (1) writing a false misbehavior report against him for failing to allow her to check his mouth to see if he had swallowed his medication and (2) by making false entries in Cole's medical records saying (a) that he had not taken an annual tuberculosis test, when he had in fact done so; (b) that he had not requested sick call on a certain date when in fact he had; and (c) that she had not treated Cole on a certain date when in fact she had. (See Cole Dep. 118-20.) Nurse Gutowksi denies making a false behavior report or false entry into his medical records (Declaration of Joyce Gutowski, dated Sept. 22,

17

2008 ("Gutowksi Decl."), ¶ 6),[11] and the record provides evidence of numerous occasions when Gutowski examined Cole and cooperated with his requests – referring him to physicians, renewing his medications, and providing him with medical supplies. (Id., Ex. B.)

Even assuming the facts in the light most favorable to Cole, though, the writing of a false misbehavior report does not in itself amount to a constitutional violation. A prisoner has "no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986). Rather, the Constitution provides a prisoner with the right "not to be deprived of a protected liberty interest *without due process of law*." Id. (emphasis added).

Assuming without deciding that a false allegation of misbehavior could entail a risk of consequences to a prisoner's liberty sufficient to trigger a due process right, Cole received the process he was due – a hearing at which he was able to contest the accusation. See Declaration of Ronnie Cole, dated Nov. 13, 2008, Ex. F.) Cole has therefore not alleged a constitutional violation and summary judgment must be granted to Gutowski.

## VII.    Nelson Muthra

Cole makes no specific claims against Muthra in his Complaint. However, in his deposition, Cole charges that Muthra improperly acted as a go-between between Dr. Perilli and Cole and refused Cole medical treatment. (Cole Dep. 120.) Cole alleges specifically that Muthra refused him access to "the doctor, treatment for the infection, the urine test, refill, whatever he could deny me. Whatever it was [ab]out, he would say he would take care of it, and he wouldn't take care of it." (Cole Dep. 121.)

---

[11] Gutowksi's Declaration is attached to the Odessky Declaration as Ex. C.

Muthra denies all of Cole's allegations and the record includes nine referrals ordered by Muthra for Cole to orthotics, audiology, and urology departments. (Declaration of Nelson Muthra, dated Sept. 22, 2008 ("Muthra Decl."), ¶ 5; Ex. A.)[12]  Even assuming that there were other occasions on which Muthra denied Cole treatment for an infection or did not follow through on something he told Cole he would take care of, Cole has not shown that the alleged deprivations were sufficiently serious to rise to the level of Eighth Amendment violations. Summary judgment must therefore be granted in favor of Muthra.

## VIII.   Cole's New Allegations Raised in Response to the Motion for Summary Judgment

In materials submitted in response to defendants' motion for summary judgment, Cole makes a number of additional allegations that amplify his claims against certain of the defendants.  In his Opposition to defendants' motion for summary judgment, Cole alleges for the first time that Fischer worked with Dr. Perilli and Nurse Hansen to delay and deny Cole the urethral reconstruction surgery in retaliation for his having filed complaints.  (Pl.'s Opp'n 18.) In his supporting affidavit, Cole alleges, among other things, (1) that he became infected and his scrotum had swollen with an abcess and broken open, and that he reported this to Muthra and Hansen but they denied him medical care; (2) that Dr. Katz of the mental health department referred him to the hospital but that, once Cole arrived there, Dr. Perilli refused to have him seen, Hansen became "real unprofessional," and Muthra refused to see or treat Cole; and (3) that Dr. Perilli, Muthra, Hansen, and Gutowski tampered with Cole's medical records and gave a false written report alleging that Cole had a non-bilateral hearing loss and that the audiologist had not recommended any special care for Cole. (Affirmation of Ronnie Cole, dated Dec. 10,

---

[12] Muthra's Declaration is attached to the Odessky Declaration as Ex. D.

2008, ¶¶ 35, 60.)

A plaintiff may not submit an affidavit that, "by omission or addition," contradicts his deposition. Hayes v. New York City Dep't of Corrs., 84 F.3d 614, 619 (2d Cir. 1996); see also Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001); Bickerstaff v. Vassar College, 196 F.3d 435, 455 (2d Cir.1999). Cole's deposition afforded him an opportunity to enumerate all of his allegations against the defendants; new allegations raised in his post-summary judgment affidavit contradict – and do not merely supplement – his deposition testimony. The defendants were entitled to conduct discovery, find out what evidence exists in support of the complaint, and then move for summary judgment without having to wonder whether Cole planned to fill in any holes they had found in his story by swearing to extra facts in response to their motion.

Cole is a pro se plaintiff but he is also an experienced litigant[13] who was given repeated opportunities, in his Complaint itself and at his deposition, to list and amplify all his claims. While courts are required to interpret a pro se plaintiff's pleadings liberally, they are not required to let a pro se plaintiff manufacture issues of fact by raising new allegations in response to a summary judgment motion. See Hayes, 84 F.3d at 619; Bennett v. Falcone, No. 05 Civ. 1358, 2009 WL 816830, at *9 (S.D.N.Y. March 25, 2009); McCullough v. Burroughs, No. 04 Civ. 3216, 2008 WL 2620123, at *4, n.6 (E.D.N.Y. June 30, 2008) (applying to pro se plaintiffs the rule that a party may not create an issue of fact by submitting statements in opposition to a summary judgment motion that contradict the affiant's previous deposition testimony).

---

[13] See, e.g., Cole v. Goord, No. 05 Civ. 2902, 2005 WL 2777313 (S.D.N.Y. Oct. 20, 2005); Cole v. Khulmann, No. 97 Civ. 3029, 2003 WL 1193728 (S.D.N.Y. March 13, 2003); Cole v. Goord, 850 N.Y.S.2d 687 (3d Dept. 2008); Cole v. Goord, 850 N.Y.S.2d 283 (3d Dept. 2008).

Accordingly, this Court will not consider any of the specific claims which Cole raises for

the first time through his submission in opposition to the motion for summary judgment.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted.

SO ORDERED.

Dated: New York, New York
      April 29, 2009

GERARD E. LYNCH
United States District Judge